**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **520 SOUTH MICHIGAN AVENUE** | ) | |
| **ASSOCIATES, LTD., d/b/a THE** | ) | |
| **CONGRESS PLAZA HOTEL &** | ) | |
| **CONVENTION CENTER,** | ) | |
| | ) | **07 C 4245** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **ALDERMAN ROBERT FIORETTI** | ) | |
| **and THE CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Congress Plaza Hotel & Convention Center ("the Hotel") sued Alderman Robert Fioretti

in his official capacity and the City of Chicago[1] claiming, among other things, that their refusal to

issue permits for the Hotel to operate a sidewalk café for the 2006-09 seasons violated its rights

under the Fourteenth Amendment and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151

*et seq.* On July 8, 9 and 13, 2009, the Court held a bench trial on plaintiff's: (1) 42 U.S.C. §

("section") 1983 damage claim; (2) claim for a declaration that defendants' denial of the permits

violates section 1983 and the NLRA; and (3) claim for an injunction restraining defendants from

interfering with its ongoing negotiations with Local 1 of the Hotel Employees and Restaurant

Employees International Union ("the Union"). The Court finds as follows.

---

[1]Because Fioretti is sued in his capacity as Second Ward Alderman, the City is, in essence, the only defendant in this suit. *See Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (stating that "[o]fficial-capacity suits . . . represent . . . another way of pleading an action against an entity of which an officer is an agent").

The Hotel is a limited partnership with its headquarters and principal place of business in Chicago, Illinois where it is engaged, *inter alia*, in the hotel business at 520 South Michigan Avenue. It is an employer in an industry affecting commerce within the meaning of the NLRA. (Proposed Final Pretrial Order, Statement A, Parties' Joint Statement Uncontested Facts ("Uncontested Facts" ¶¶ 2, 3.) The Hotel is located in the City's Second Ward.

In June 2003, the Hotel's Union employees went on strike and have been picketing in front of the Hotel ever since. (*Id.* ¶ 1; Trial Tr. ("Tr.") 254.) The Union's labor dispute with the Hotel is governed by the NLRA.

From 1993 until May 18, 2007, Madeleine L. Haithcock was the Alderman of the City's Second Ward. (Uncontested Facts ¶ 8; Tr. 17.) In her final bid for reelection, she was defeated by Robert Fioretti, who has been the Second Ward Alderman since May 21, 2007.

**Aldermanic Authority**

To succeed on its claims, plaintiff must prove that the Second Ward Alderman's actions can properly be attributed to the City. In the context of section 1983, that means plaintiff must prove that the Alderman had "final policymaking authority" with respect to its applications for sidewalk café permits. *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004). Whether Haithcock and/or Fioretti "ha[ve] final policymaking authority is a question of state law" that the Court resolves by "[r]eviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quotations omitted).

2

Illinois law grants "the corporate authorities of each municipality," in this case, the "mayor and aldermen," authority to "pass all ordinances and make all rules and regulations proper or necessary, to carry into effect the powers granted to municipalities." 65 Ill. Comp. Stat. 5/1-1-2(a), 5/1-2-1. Pursuant to that authority, the City has enacted the Municipal Code of Chicago ("Municipal Code") which, among other things, prohibits the operation of a sidewalk café without a permit. *Id.* § 10-28-805. The Municipal Code instructs those who wish to open a sidewalk café to submit a permit application to the City's Department of Business Affairs and Consumer Protection, formerly known as the Department of Business Affairs and Licensing ("the Department"). *Id.* §§ 10-28-800, 810. Thereafter, the Municipal Code, states:

> [T]he department shall review a submitted application for compliance with this article [of the Municipal Code] and regulations. . . . If the Director finds that the applicant meets the requirements of this article and the regulations promulgated hereunder, the director shall provide the application to the alderman of the affected ward, together with a recommendation for introduction of an ordinance approving the application. Such approval shall not be unreasonably withheld. Upon passage and publication of an ordinance approving the application, the director shall issue the sidewalk café permit to the applicant.

*Id.* § 10-28-820(A). A sidewalk café permit is valid from March 1 through December 1 of the year for which is issued. *Id.* § 10-28-805.

Though the Municipal Code makes aldermanic approval, evidenced by introduction of an ordinance, a pre-condition to obtaining a permit, in theory, that requirement does not give aldermen absolute power over permits. Their power is ostensibly limited by the Municipal Code's admonition that aldermen "not unreasonably withh[o]ld" approval and its requirement that the City Council vote on all permit ordinances. *Id.* In reality, however, as the evidence clearly shows, the City Council delegated its final decision making authority over the Hotel's sidewalk café permit applications to the Second Ward Alderman. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (stating that

3

"[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority" (quotation omitted)).

In general, the record shows, the process for obtaining a sidewalk café permit begins when the applicant submits the completed application and supporting drawings to the local alderman. Once the alderman approves the application, by signing the line in the "Aldermanic Approval" box that is printed on the application, he or she submits it to the City Clerk to be introduced as an ordinance at a City Council meeting. After the application/ordinance is introduced, the City Council refers it to its Committee on Transportation and Public Way ("Transportation Committee"). After the application has been referred to the Committee, but before it is approved by the Committee or the full City Council, the Department issues a temporary permit to the applicant, which allows it to open the sidewalk café. The Committee then holds a public hearing at which sidewalk café permits are approved *en masse* by a single vote without any discussion. The approved applications are then sent to the full City Council, which votes on them *en masse*. After that vote, an ordinance issues approving the sidewalk café and the applicant can obtain its permit. (Tr. 313-15.)

That was the process the City followed with respect to the Hotel's 2006 sidewalk café permit application. Former Alderman Haithcock testified that she received and approved the Hotel's application in March 2006. (*Id.* 22.) At the June 28, 2006 City Council meeting, she introduced the application as an ordinance to be referred to the Transportation Committee. (*Id.*; *see* Pl.'s Ex. 26.) A month later, the Hotel received a document from the Department entitled "CITY OF CHICAGO DEPARTMENT OF BUSINESS AFFAIRS AND LICENSING SIDEWALK CAFÉ PERMIT." (Pl.'s Ex. 14.) The permit, which was "issued on 07/27/2006," states: "Pursuant to the Ordinances passed by the city council of the city of Chicago on 06/28/2006 (pending passage) permission and

4

authority is hereby given and granted to THE CONGRESS HOTEL . . . to maintain and use a portion of the right-of-way for a sidewalk café . . . ." (*Id.*) It authorizes the Hotel to operate the sidewalk café "from and after March 1, 2006 through and including December 1, 2006" but also says that "THIS PERMIT IS REVOCABLE by the Director of Business Affairs and Licensing at any time." (*Id.*)

Less than a month later, Alderman Haithcock wrote a letter to Alderman Allen, Chairman of the Transportation Committee, asking that "item number three [on the agenda for the Transportation Committee's meeting later that day] . . . for the Congress Hotel . . . for a sidewalk café . . . be **deferred** until further notice." (Pl.'s Ex. 12 (emphasis original).) Haithcock did not give any reason for the deferral request, and the Transportation Committee did not ask for one. Instead, it simply granted her request. (Pl.'s Ex. 15.) As a result, the Department told the Hotel in an August 28, 2006 letter, "the permit issued pending passage of the ordinance has been canceled. You must cease and desist operation of the sidewalk café." (*Id.*)

After receiving that letter, plaintiff's attorney, Dan Graham, asked the Department why the permit had been canceled. He was told to speak to Alderman Haithcock because it was her vote to defer the Transportation Committee's consideration of the application that triggered the permit cancellation. But Alderman Haithcock was not a member of the Transportation Committee, and thus, could not possibly have voted for the deferral. (Tr. 35.)[2]

On September 1, 2006, Graham wrote a letter to Alderman Haithcock asking for an explanation. (*Id.* 483.) Her office responded that she was concerned because she had received some

---

[2]As discussed below, the only credible explanation for its belief that Haithcock made the deferral decision is that the Department, which is responsible for processing café permit applications, knew she controlled the fate of the Hotel's application.

5

complaints about the Hotel's condition.[3] (*Id.*)  Graham offered to hold a meeting at the Hotel so the Alderman could see it and requested a copy of the complaints she had received.  (*Id.* 483-84.)

Haithcock's office never gave Graham any documents, but the parties did meet on September 12, 2006 at the Alderman's office.  (*Id.* 485.)  During the meeting, Haithcock said she was impressed with the Hotel's presentation and would once again support its sidewalk café application. (*Id.* 487-88.)  Shortly thereafter, Graham sent a letter to Transportation Committee Chairman Allen, reporting that Alderman Haithcock had renewed her support for the Hotel's application.

On September 19, 2006, Allen sent a letter to the Department, saying:

> Alderman Madeleine L. Haithcock (2nd Ward) introduced an ordinance at the June 28, 2006 City Council meeting granting permission to the **Congress Plaza Hotel & Convention Center** to maintain and use a portion of the public right-of-way for a sidewalk café adjacent to the premises at **520 South Michigan Avenue**.

> Please issue the appropriate permits to **Congress Plaza Hotel & Convention Center** pending passage of this ordinance in the Committee on Transportation and the Public Way.

(Pl.'s Ex. 26 (emphasis original).)  In addition, Graham received a notice from Allen saying that, in light of Alderman Haithcock's renewed approval, he would have the application placed on the agenda for the next Transportation Committee meeting.  (Tr. at 490-93.)

As Allen promised, the Hotel's application was on the agenda for the October 3, 2006 Transportation Committee meeting.  (*See* Pl.'s Ex. 162.)  At that meeting, however, Haithcock once again withdrew her support for the Hotel's application.  She did so, Graham said she told him, because the Union opposed the application and she needed its support in the upcoming election.  (Tr.

---

[3]There is no evidence that Haithcock or anyone else ever told the Transportation Committee about the alleged complaints.

499-501.)  She suggested plaintiff bring the permit application back to her in the spring, after she had been re-elected.  (*Id.* 501.)

Not surprisingly, Haithcock's recollection of that meeting is somewhat different.  Though she admitted that the Union had opposed her in the primary election (*id.* 27-28), she could not recall there being any relationship between her desire to secure its support in the general election and her actions on the Hotel's permit application.  (*Id.* 29-30.)  Rather, she said she received complaints about roaches, dirty carpets, and "a lot of different things" from people who stayed at the Hotel.  (*Id.* 37.)  However, she did not investigate the source of these complaints and could not provide any details about them.  (*Id.* 42-44.)  Moreover, she had no personal knowledge of any problems with the Hotel and, in any event, did not deem them serious enough to mention them in the deferral request she sent to Transportation Committee Chairman Allen.  (*Id.*)

Regardless of her reasons, the result of Haithcock's withdrawal of support is undisputed: The Hotel's application was not sent to the City Council for a vote.

This evidence establishes that neither the Transportation Committee nor the Department independently examined the merits of the Hotel's application before scheduling and deferring a vote on the application or issuing and canceling the temporary permit.  Rather, they considered only one thing:  whether Alderman Haithcock approved.  After she approved the Hotel's application and introduced it as an ordinance at the June 28, 2006 City Council meeting, the Transportation Committee put the application on its agenda and the Department issued a permit "pending passage" to the Hotel.  A few weeks later, when Haithcock withdrew her support for the Hotel's application, the Committee refused to consider it and the Department cancelled the temporary permit.  Later, when the Alderman renewed her support, the Transportation Committee immediately put the Hotel's

7

application on the agenda for its next meeting.  When she withdrew her support once again, the Transportation Committee again deferred consideration of the application. The only reasonable conclusion that can be drawn from the lock-step actions of Haithcock, the Department and the Transportation Committee is that the alderman, and the alderman alone, controlled the fate of the Hotel's 2006 application for a sidewalk café permit.

After Fioretti was elected Second Ward Alderman in May 2007, the Hotel approached him, as it had Haithcock before him, for approval of its café permit.  Fioretti said he spoke with Hotel representatives about permit applications, but his memory of those interactions was spotty.  For example, when he was asked whether "at any . . . time for the 2007 sidewalk season, [he ever] approved or signed anything for the Congress Hotel relating to a sidewalk café?", Fioretti responded:  "I have to say that I was never given an outdoor café license request application from the hotel."  (Tr. 85-86.)  However, after seeing the Hotel's permit application for the 2007 season (Pl.'s Ex. 156-9), Fioretti recalled receiving it but had no idea why it had been sent to him:

> Q.  Do you recognize this document?
> A.  Do I recognize it?
> Q.  Yes.
> A.  No.  I have no idea.  It's a fax copy.  Yes, I do – I do know what it is.
> Q.  What is it?
> A.  Well, I would say it was a sidewalk café application.
> Q.  And can you tell from this document, sir, what year it's for?
>  . . . .
> A.  2007.
> Q.  And do you see on the first page of the application a box on the bottom that talks about aldermanic approval?  Do you see that, sir?
> A.  Ald – yes.
> Q.  Did you ever sign the hotel's application of which this is a copy?
>  . . . .
> A.  My answer is no.  I don't know why it was given to me.

(*Id.* 87-88; *see id.* 89 ("I have no idea why I was given the document.").)  Given that the permit application says "You must obtain approval from the alderman of the ward where your proposed use of the public way is located" and contains a line for the "alderman's signature" (Pl.'s Ex. 156-9), this testimony has no credence.

Fioretti also suggested that the 2007 application was flawed or incomplete, saying he had "some concerns" about it when plaintiff's architect brought it in.  But his testimony about those "concerns" was nonsensical:

> The – the last few pages that were – well, first of all, it was a faxed copy.  I informed [the] architect that I do not take – I – first of all, we have to – if you want to understand the concerns, I was – I would never have entertained – and I was told that there was an immediate – that [the] architect came here unannounced to my office, which is fine because we receive a lot of people unannounced.  He needed to see me to sign certain documents.  And I said I can't see him right now.  We were right in the middle of the first budget discussions, first budget hearings; and at that time, he insisted that I come out and see him.  I came out.  I don't know if it was – first of all – and I explained to him this is a faxed copy and it wasn't completed.  I don't believe – as I say this, I can't – I don't recall whether or not all of the drawings were there in the back.

(Tr. 93-94.)

On cross-examination by his own counsel, Fioretti tried to add some clarity.  He explained that he meant "xeroxed" when he said "faxed" and said he has a policy against signing "xeroxed" copies.  (*Id.* 147.)  But he did not explain what was missing from the "incomplete" application or what information he expects sidewalk café applications to contain.  Nor did he say whether he told the Hotel that the application was incomplete or what information was missing.

Fioretti's recall was no better with respect to the Hotel's application for the 2008 season (Pl.'s Ex. 72), or its application for the 2009 season (Pl.'s Ex. 87), which he was not even sure he received.  (Tr. 94-102.)  Yet, in his deposition, he testified that he received an application from the

9

Hotel in 2007, which he "sent back" to the Hotel, and that it was one of two such applications he had been given. (*Id.* 95-98.)

Fioretti's "confusion" notwithstanding, the record is crystal clear on one point: He never introduced an ordinance in the City Council for approval of a sidewalk café permit for the Hotel.

Fioretti also testified about aldermanic privilege, which he said is nothing more than an acknowledgment that the ward alderman knows his or her ward better than anyone else. However, Hanah Jubeh, who worked for nine years with Alderman Pope, campaigned and worked for Fioretti until September 2007, and spent years doing economic development work for the City, had a different view. (*Id.* 155-58, 179-80.) Jubeh, who saw several thousand permit applications during her career with the City, said that, generally, the Alderman of the affected ward must approve a permit application for it to be granted. (*Id.* 180.) Asked how she knew this, she responded: "It's common knowledge, I guess." (*Id.* 181.) Moreover, though she claimed at trial that she did not know what happened when "the alderman didn't sign a particular application for [a sidewalk café] permit" (*id.*), she admitted giving the following testimony in her deposition:

| | |
|---|---|
| Answer: | Well, when a request is poised to the alderman relative to a project in his ward, he usually generally has to be in support of them. |
| Question: | And what happens if he's not? |
| Answer: | Then the part – it doesn't move forward. |
| Question: | And other aldermen don't support the project either; isn't that correct? |
| Answer: | Correct. |
| Question: | It's called aldermanic privilege? |
| Answer: | Yes. |
| | . . . . |
| Question: | How did you first become aware of aldermanic privilege? |
| Answer: | Well, when I first started with the City, I mean, that's kind of what I did. |

(*Id.* 182-83.)

10

Ty Tabing also testified about aldermanic privilege. (*Id.* 215.) Currently, Tabing is the executive director of the Chicago Loop Alliance, the chamber of commerce that promotes business in downtown Chicago. (*Id.* 216.) Before joining the Alliance, Tabing was an Assistant Commissioner in the City's Department of Planning and Development, overseeing real estate development projects in the Chicago Loop. (*Id.*) In Tabing's experience, aldermanic privilege means that "49 [of the fifty Chicago] aldermen who are not representing the area where development is being considered defer to the alderman who represents that area." (*Id.* 234.)

Plaintiff also offered expert testimony on aldermanic privilege from Bernard Citron. Citron has a bachelor's degree in architectural science from the University of Illinois and a law degree from The John Marshall Law School. (*Id.* 305.) While attending law school, he worked for an architectural firm, starting as a draftsman and working his way up to project manager, on projects in both the City and the suburbs. (*Id.* 305-06.)

After graduating from law school, Citron's first job was with the City's Law Department, where he spent four years prosecuting building code and zoning ordinance violations in housing court. (*Id.* 307.) After that, he spent two and one-half years in the Law Department's real estate division, answering questions and giving legal advice to the City's various development and zoning agencies on procedural and substantive land-use issues. (*Id.* 307-08.) During his tenure with the real estate division, he worked monthly with the Department of Transportation on issues involving the use of the public right-of-way. (*Id.* 309-11.)

In 1986, Citron joined a private law firm, concentrating on municipal land-use issues, most of which involve the City. (*Id.* 311-12.) Among other things, he helps clients obtain variances and

11

permits necessary to proceed with development projects, including those for use of the public right-of-way. (*Id.* 312-13.)

Citron testified that since 1999, he has submitted approximately 350 sidewalk café permit applications to the City. (*Id.* 316-18.) Not one of them, he said, was approved without the local alderman's approval. (*Id.* 318.) In fact, Citron said, an application for a sidewalk café permit that is not signed by the local alderman is never introduced as ordinance, referred to or approved by the Transportation Committee or sent to the full City Council for a vote. (*Id.* 316.) Without aldermanic approval, he said, an applicant simply cannot obtain a permit for a sidewalk café. (*Id.* 326-27.)

Citron's understanding of aldermanic privilege is based on his twenty-six years' experience practicing land-use law in the City. But, as the defense pointed out in cross-examination, he does not know what happened to any land-use applications with which he was not personally involved, including the Hotel's sidewalk café applications. (*Id.* 339-40.) Moreover, Citron has not applied any scientific methodology to an aggregated database or representative sample to test his conclusions and opinions. (*Id.* 341-46.) Thus, though the observations underlying Citron's opinions span decades and encompass a multitude of permit requests, the lack of statistical analysis to support his opinion limits its probative value.

As defendants point out, however, Fioretti, Jubeh and Tabing testified that the local alderman's opposition does not necessarily doom all projects. (*See id.* 124, 180-84.) But Fioretti admitted that not "one project that [he had] not approved . . . [was] passed by the City council since [he's] been alderman," Jubeh could not recall a single permit application of the thousands she saw during her tenure with Alderman Pope that was issued without his approval and Tabing, who has spent twelve years working on Loop development projects, could identify only one, relocation of

12

the Chicago Children's Museum, that proceeded despite the alderman's opposition. (*Id.* 126, 213-17.)

Defendants also contend that Fioretti's recent introduction of eleven ordinances to allow the Hotel to use the public way undermines plaintiff's argument. (*See* Uncontested Stipulated Facts ¶ 32.) But each of these ordinances gave the Hotel access very limited access to the public right-of-way – to install canopies or light fixtures, for example – none of which generated revenue for the Hotel. (*Id.*; Tr. 150-51, 558-61.) Moreover, all of these permit applications were submitted after the Hotel filed suit and, as the parties stipulated, "were routed through Defendants' counsel for processing, by mutual agreement of . . . counsel." (Uncontested Stipulated Facts ¶¶ 31-32.)

Defendants further assert that the evidence concerning the Hotel's 2009 application refutes the notion that aldermanic privilege is an ironclad rule. In fact, this evidence has the opposite effect. The parties have stipulated that, despite Fioretti's opposition, the Department introduced an ordinance to approve the Hotel's 2009 sidewalk café application at the May 13, 2009 City Council meeting. (*Id.* ¶ 24.) At the same meeting, Fioretti introduced nine other ordinances for Second Ward sidewalk cafés that he had approved. (*Id.* ¶¶ 24, 27-28.)

All ten ordinances were referred to the Transportation Committee, which placed them on the agenda for its June 1, 2009 meeting. (*Id.* ¶¶ 24-29.) During that meeting, the Committee passed the nine ordinances Fioretti had sponsored but deferred consideration of the Hotel's ordinance to its meeting on June 25, 2009. (*Id.* ¶¶ 25-26A, 28-29.)

At the June 25, 2009 meeting, the Committee addressed the Hotel's sidewalk café application and forty-eight others. (*Id.* ¶¶ 26B-D.) The Committee passed the forty-eight other applications, all of which had been signed and approved by the affected alderman. (*Id.*) The only application the

13

Committee did not pass was the Hotel's, which Fioretti had not signed or approved. (*Id.*; *see* Pl.'s Ex. 188 (Transportation Committee Agenda for 6/25/09 Meeting).)[4]

In sum, the credible evidence clearly establishes that the City Council delegated its final policy-making authority with respect to the Hotel's 2006-2009 sidewalk café permit applications to the Alderman of the Second Ward. The permit application itself has an "aldermanic approval" section with a line for the alderman's signature. Moreover, the sequence of events – as established by the testimony of Graham, Haithcock and Fioretti, the Hotel's permit applications, the temporary permit and subsequent cancellation notice, the letters to and from the Hotel, the Department, Haithcock, Fioretti, and Allen, and the parties' stipulated facts – and the utter lack of evidence that the Transportation Committee considered anything but the Second Ward Alderman's wishes when it voted on the Hotel's applications show that the approval process for the Hotel's applications mirrored, *precisely*, the desires of the sitting Second Ward alderman. Hanah Jubeh, Bernard Citron and Ty Tabing, all of whom have extensive experience working for and with the City on sidewalk café permits, admitted not only that aldermanic privilege exists but that it prevents sidewalk café permits and virtually all other land-use permits from being issued without the local alderman's approval. Finally, though Jubeh, Tabing and Fioretti testified that aldermanic privilege is, on rare occasions, overruled, there is not a shred of evidence that the Hotel's applications were among those rare exceptions.

Despite the overwhelming evidence that the Council delegated its final policymaking authority over sidewalk café permits to the Second Ward Alderman, the City argues that it cannot

---

[4]The City contends that plaintiff's failure to introduce the tape of June 25, 2009 Transportation Committee meeting, listed as an exhibit in the final pretrial order, gives rise to the inference that the tape would be unfavorable to it. But the tape was equally available to defendants, who did not offer it at trial either. The only inference the Court draws from the fact that neither side introduced this evidence is that has little or no probative value.

be held liable for Haithcock and Fioretti's actions. In support of its argument, the City cites *Baskin v. City of Des Plaines*, 138 F.3d 701 (7th Cir. 1998), an appeal of a Rule 12(b)(6) dismissal of a section 1983 complaint. *Id.* at 702-03. The plaintiff in *Baskin* argued that a police officer's unconstitutional conduct could be attributed to the city that employed him because city officials had ratified the officer's actions. *Id.* at 705. The *Baskin* court said that a municipality can be held liable under section 1983 on a ratification theory only if "a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Id.* Because plaintiff's allegations that the city would not accept his complaint against the officer and took no action against him fell short of this standard, the *Baskin* court affirmed the dismissal. *Id.*

Unlike the plaintiff in *Baskin*, the Hotel does not claim that the City ratified the actions of an employee who did not have final policymaking authority. Rather, the Hotel contends that the City Council, through the custom and practice of aldermanic privilege, delegated its final policymaking authority with respect to the issuance of sidewalk café permits in the Second Ward to its Alderman. Consequently, *Baskin* has no application to this case.

The City's reliance on *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), is similarly misplaced. The plaintiffs in that case sued the City claiming that its ordinance requiring churches to obtain special use approval to operate in areas zoned for commercial use violated their constitutional rights. *Id.* at 755-56. Plaintiffs argued that the City could be held liable under section 1983 because the alderman who introduced the contested ordinance, which the City Council ultimately enacted, was motivated by illegitimate animus. *Id.* at 763-64. The district court granted summary judgment for the City, a decision the Seventh Circuit affirmed saying:

> [T]he possibility that Alderman Huels' motives for wanting to have the property rezoned were illicit in no way demonstrates that the City Council and the Mayor,

15

who have final authority under state law to enact city ordinances, *see* 65 I.L.C.S. §
5/1-2-1(2), endorsed any such motives. Absent some evidence that the
policy-making body, in this case the City Council, approved both the rezoning *and*
the illicit motivation therefor – and Appellants offer none – Chicago cannot be held
liable for Alderman Huels' actions.

*Id.* at 764 (emphasis original).

There is no tension between *Civil Liberties* and this case. Among the ordinances the City

Council has enacted pursuant to the statutory authority noted in *Civil Liberties* are the Municipal

Code provisions governing permits for sidewalk cafés. Moreover, as discussed above, those

provisions vest the City Council with final decision-making authority with respect to such permits.

*See* Municipal Code of Chicago § 10-28-820(A). But the City Council can delegate that authority,

*see Praprotnik*, 485 U.S. 112, 124 (1988), and the evidence establishes it did.

Certainly, as the City points out, it cannot be held liable under a delegation theory simply

because its officials "go[] along with discretionary decisions made by [their] subordinates." *Id.* at

130 (holding that a city's failure to have higher officials review supervisors' decision to transfer

plaintiff and making its civil service commission's review of such decisions highly deferential did

not constitute a delegation of the city's statutory authority over employment decisions to plaintiff's

supervisors). Thus, if the evidence showed that the City Council simply gave substantial deference

to Haithcock and Fioretti's opinions about the Hotel's permit applications, there would be no

liability by delegation.

That is not, however, what the credible evidence shows. Rather, as detailed above, it shows

that the City Council rubber-stamps the Second Ward alderman's permit decisions, a practice that

is "not authorized by written law or express municipal policy, [but] is so permanent and well-settled

[that it] constitute[s] a custom or usage with the force of law." *Id.* at 127 (quotation omitted). The

16

City cannot "insulate [itself] from [section 1983] liability simply by delegating [its] policymaking authority" over sidewalk café permits in this manner. *Id.* at 126. *Cf. Campion, Barrows & Assocs., Inc. v. City of Springfield*, 559 F.3d 765, 770 (7th Cir. 2009) (affirming summary judgment for city on claim that its termination of an employment contract violated section 1983 because state and local law gave the city council final authority over such matters and plaintiff offered no evidence that "there was an established municipal custom giving the mayor the *de facto* power to handle [such] matters . . . unilaterally or to impose his wishes on the City Council and use it as a rubber stamp").

The City also argues that it cannot be held liable because plaintiff offered no evidence of the Transportation Committee members' motives for voting against the Hotel's applications or proof that the Committee members knew about or approved of Haithcock or Fioretti's reasons for opposing them. As noted above, however, the Hotel's theory is that the Council delegated its authority to the Second Ward Alderman not that the Alderman took unauthorized action that the Council later ratified. Thus, plaintiff is not required to prove *why* the City Council delegated its authority, it just has to prove that the delegation actually occurred. Plaintiff did so by presenting substantial circumstantial evidence that the members of the Transportation Committee exercised no judgment whatsoever with respect to, and made no independent determination on, the Hotel's applications for a sidewalk café permit. Thus, unlike the plaintiff in *Campion*, the Hotel proved that, despite the provisions of the Municipal Code, the Second Ward Alderman controlled the fate of its permit applications.

In short, plaintiff has established that when the Hotel submitted its applications for sidewalk café permits, the City Council had delegated its final policymaking authority to approve or deny those applications to the Second Ward Alderman via the custom or policy of aldermanic privilege.

17

Thus, the Court holds that, by virtue of the policy of aldermanic privilege, the final policymaker in this case was the Alderman of the Second Ward.

**Equal Protection**

That is only half the battle, however. To succeed on its section 1983 equal protection claim, plaintiff must also prove that Haithcock or Fioretti intentionally treated it differently than other sidewalk café applicants and "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Other Second Ward sidewalk café applicants are situated similarly to the Hotel if they are "identical to [the Hotel] in all relevant respects." *Sellars v. City of Gary*, 453 F.3d 848, 850 (7th Cir. 2006) (quotation omitted); *see Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 681 (7th Cir. 2005) ("Various factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment.").

Plaintiff offered no evidence about businesses that were granted permits to operate sidewalk cafés in 2006 and 2007, but proved that a number of businesses located near it operated such cafés in 2008 and 2009. (*See* Tr. 521-32; Pl.'s Exs. 125 & 194.) Most of those businesses are restaurants or taverns which, as plaintiff tacitly admitted, are not situated similarly to the Hotel. (Tr. 521 (Nahmias' testimony that the Hotel's competition is "[a]ll the hotels in Chicago").)

There are, however, five hotels in that group – the Hilton, the Essex, the Hard Rock, the Best Western and the Blackstone. (*Id.* 521-32; Pl.'s Exs. 125 & 194.) Moreover, because the Municipal Code requires sidewalk café operators to obtain a license each year, *see* Municipal Code of Chicago

§ 10-28-805, the record supports the inference that, like plaintiff, these five hotels submitted applications for sidewalk café permits for 2008 and 2009.

Plaintiff did not, however, offer any evidence about those applications. As a result, there is no evidence that the cafés for which the other hotels obtained permits were the same size, had the same seating capacity, occupied the same amount of public way space or had the same days and hours of operation as the Hotel's contemplated café. Absent such evidence, plaintiff has not proved that defendants' violated its equal protection rights. *See United States v. Moore*, 543 F.3d 891, 896-97 (7th Cir. 2008) (stating that class-of-one equal protection plaintiff must "first show that he was intentionally treated differently from others similarly situated" (quotation omitted)); *Woodruff v. Mason*, 542 F.3d 545, 554 (7th Cir. 2008) (not reaching the rational basis element of a class-of-one equal protection claim "[b]ecause the first element is dispositive").


**NLRA**

To prevail on its NLRA claim, plaintiff must prove that Haithcock or Fioretti used their authority over the permit process to try to force the Hotel to settle its dispute with the Union. *See Golden State Transit Corp. v. City of L.A*, 475 U.S. 608, 619 (1986) (stating that conditioning the receipt of government benefits on an employer's settlement of a labor dispute impermissibly intrudes into the collective-bargaining process and interferes with the policy underlying the NLRA).

There is little evidence about Haithcock's intent with respect to the Hotel's 2006 applications. Though she recalled speaking to Union representatives "in [her] office" and "on the phone" about the application, she could not recall the specifics of any conversation and was not sure whether they occurred before or after she withdrew her support for the Hotel's application. (Tr. 21.)

19

Moreover, though Graham testified that Haithcock said she would not support the Hotel's application because the Union opposed it, Haithcock, who was the only other party to the conversation, disputes that testimony. (*Id.* 29-30, 499-501.) Finally, in a letter dated three days before Haithcock asked the Committee to defer the Hotel's application, the Union reports to Transportation Committee Chairman Allen that Haithcock is opposed to the application. (*See* Pl.'s Ex. 12.) But Haithcock denies that her actions were influenced by the Union, and the record shows that the Union had publicly denounced her before she withdrew her support for the Hotel's application. (Tr. 26-30, 40-41.) On the whole, the evidence is insufficient to establish that Haithcock's denial of the 2006 permit application was in violation of the NLRA.

The situation is different for Fioretti. The record shows that the Union, which had supported Haithcock in each of her prior successful bids for the Second Ward seat, did not support her in the 2007 election. (*Id.* 26-28.) In fact, it actively campaigned against her by sending people into her ward and disseminating negative messages about her in print and on the airwaves. (*Id.*) Fioretti was the candidate the Union endorsed, through advertisements and direct voter appeals, and he was the candidate who won. (*Id.* 28, 76-77, 255-57.)

On June 15, 2007, the Union held a rally to celebrate the anniversary of the Hotel strike. The video tape of the rally shows Union president, Henry Tamarin, calling Alderman Haithcock "old what's her name" and then introducing Fioretti as "an alderman we can be proud of." (Pl.'s Ex. 167.) Fioretti then steps up and thanks the audience, which is comprised predominantly of Union members, for their support during his campaign. He then describes the Second Ward as "a union ward" and exhorts the crowd to support the Hotel picketers not just at rallies but in the heat of summer and the cold of winter as well. He continues by saying: "This strike has to end. It has to

end this year. . . .  I'm going to do whatever I can . . . whether its permits because all of the sudden they want to have a garden rooftop and they're never going to get a permit up there."  With that statement, Fioretti clearly conditioned the Hotel's receipt of permits, which he controlled, to its resolution of the strike.  He continues by saying "I know" the Hotel is doing "illegal work inside" and he promises to catch them and "fine them to the maximum," yet another threat to use City powers to punish the Hotel for its stand against the Union.[5]

Three days after the rally, Anthony Adkins, the designer who prepared the plans for the Hotel's sidewalk café, went to Fioretti's office to set up a meeting about the permit application.  (Tr. 46-50.)  Adkins said the Alderman wanted to review the café drawings before they met and asked him to have the Hotel's owners attend the meeting because he wanted to talk to them about the strike.  (*Id.* 50.)  Adkins gave Fioretti the requested drawings (Pl.'s. Ex. 155), and the meeting was scheduled.  (Tr. 51-54.)  Jubeh, Fioretti's employee and long-time friend, corroborated Adkins' testimony.  (*Id.* 169-70.)

The meeting was held on July 9, 2007, with Fioretti, Jubeh, Adkins, plaintiff's attorney Peter Andjelkovich and Shlomo Nahmias, the Hotel's president, in attendance.  (*Id.* 59, 170.)  According to Adkins, after introductions were made, Fioretti said he would not approve or sign off on any permit applications for the Hotel because he had promised the Union he would not do so until the strike was settled.  (*Id.* 60.)  Though Andjelkovich told Fioretti that it was illegal to condition the issuance of a permit on the resolution of the strike, Fioretti said he would not change his position. (*Id.* )

---

[5]At a similar rally in June 2008, Fioretti again said the strike must end and that the Union only sought justice and fairness.  (*See* Pl.'s Ex. 166.)  He did not, however, say or imply that the Hotel would not get a permit until the strike was settled.  Because the videotape of the second rally suggests only that Fioretti supports the Union, which is completely permissible and amply illustrated by other evidence in the record, it has little probative value.

Jubeh also admitted – albeit, after being confronted with her deposition testimony – that Fioretti opened the July 9, 2007 meeting by asking about the strike. (*Id.* 170-72.) But she did not recall Fioretti telling the Hotel's representatives that he would not approve any permits while the strike was going on, and she flatly denied that he told them he had made such a promise to the Union. (*Id.* 183-84.) Although she took notes during the meeting, Jubeh said she has been unable to locate them. (*Id.* 193)

Fioretti's memory of the July 9, 2007 meeting is quite dim. Though he remembers attending it, he said he could "not [recall] right now" what anyone said. (*Id.* 79.) He was also unsure whether he referred to the strike as a blight during the meeting, though he may have. (*Id.* 80.) Similarly, he does not recall whether, during the meeting: he mentioned the building code or the Hotel's alleged building code violations; he was asked to approve the Hotel's application for a sidewalk café permit; Andjelkovich asked him for a letter of approval for a sidewalk café; or there was any discussion about a rooftop addition to the Hotel. (*Id.* 80-81.) Yet, when he was confronted with his deposition testimony, he admitted: "[I] may have said something like I would hope that we could resolve this issue of the strike before we get to the issue of the rooftop." (*Id.* 82-83.) In spite of all the uncertainty about what he did say at the meeting, Fioretti knows for a fact what he did *not* say: (1) that he would not approve a permit for the Hotel while the strike was pending; and (2) that he made such a promise to the Union. (*Id.* 81)

Fioretti's memory failed him once again when he was asked whether he had discussed the Hotel's permit application with Union president Tamarin. He thinks he probably had a "passing conversation" about it with Tamarin, but when he was asked why he would have such a discussion with the Union president, Fioretti answered:

> Maybe because it was part of the litigation and there may have been a whole host of reasons, none of which I recall. I could have been on the street with him, talked to him on the phone. And quite frankly, I – I don't – as I sit here right now, I don't recall what the reason was. There may have been, but obviously it's an ongoing source of friction in the city.

(*Id.* 112.)

When he was asked whether he had discussed this lawsuit with Tamarin, Fioretti was similarly evasive. (*Id.* 114.) After he was pressed for an answer, Fioretti admitted telling Tamarin about settlement letters that had been drafted and that any settlement would be conditioned on his approval of the Hotel's sidewalk café. (*Id.* 116.) Fioretti also said he told Tamarin that he would "make the right decision," but Tamarin should not be surprised if he heard that the case was being resolved "in some sort of fashion." (*Id.* 119.) When he was asked why he would discuss the settlement of this case with Tamarin, the Alderman answered:

> I don't know. I may have just said there's two – a couple of letters that they want me to sign or a couple of permits that they may have signed. I don't know, you know, all the details. We were discussing that this case is close to settlement. The parties want me to sign a application for an outdoor café, which they can – they don't need my signature to go through the process and obtain a license. And I don't know if there was anything really regarding the –

(*Id.* 116-17.)

In any event, Fioretti admitted that he considered the Hotel's posture in the labor dispute in determining whether to approve its application, though he couched it this way: "[W]e should have good labor relations. . . . One of the factors is how they treat their workers, their laborers. All of that is a factor in a sign-off on the outdoor café." (*Id.* 84.)

Tamarin's memory of these events is no better. He said he knew aldermanic approval played some part in the permit process, but claimed he was ignorant about the details of that process. (*Id.* 258-62.) He also said he is sure he discussed the Hotel's labor dispute with Fioretti, and recalls that

Jubeh and Lars Negstad, the Union's Research Director, attended "at least one meeting" on the subject, but he has no recollection whatsoever of when or where any such discussions occurred, or what he, Fioretti or anyone else said. (*Id.* 257-59.)

Nonetheless, Tamarin admitted that the Union was opposed to the Hotel's obtaining a sidewalk café permit – "I think anything that helps the . . . Hotel in any fashion is a problem" – and expressed that opposition to Fioretti. (*Id.* 263.) He said the Union's opposition was partially rooted in its concern for the broader community, as reflected by its letter to Transportation Committee Chairman Allen urging him to deny the permit application because of the Hotel's substandard conditions. (*Id.* 259-60; *see* Pl.'s Ex. 12.)

But Tamarin also admitted that the Union had no concerns about the Hotel's condition before the strike began (Tr. 259-60), an admission from which three possible inferences can be drawn: (1) the Union did not care about the Hotel's condition, as long as a Union contract was in place; (2) there was a direct, but entirely coincidental, relationship between the Union's perception of the Hotel's condition and the strike; or (3) the Hotel's condition was not really a cause for concern. Based on the evidence presented at trial, the first two inferences – that the Union did not care about the condition of the Hotel in which its members worked or its concerns about the Hotel's condition arose, purely as a matter of chance, at the same time as the strike – are wholly unreasonable. Thus, the only credible inference Tamarin's admission supports is that the Union's "concerns" about the Hotel's condition were illusory.

Jubeh's memory with respect to contact with the Union was slightly better than Fioretti and Tamarin's. She testified that she and Fioretti had a conference call with Tamarin about the July 9, 2007 meeting with the Hotel's representatives and they did so "[b]ecause the strike was going on.

24

I mean, it's a business in the ward. They have an interest." (*Id.* 186.) Jubeh's answer echoes Fioretti's deposition testimony that he might discuss this lawsuit with Tamarin "because [the Union] was a party in a sense. Not a party per se, but this all arises because of this strike." (*Id.* 119-20.)

Fioretti's purported lack of memory about his discussions with Tamarin is completely unbelievable. It is clear, from Fioretti's own words at the June 2007 Union rally, that he strongly supports the Union and its strikers. So strongly, in fact, that Fioretti asked Jubeh to attend a bargaining session between the Union and the Hotel, where she sat with the Union staff, in the summer of 2007. Given his staunchly pro-Union position, the Court simply does not believe that Fioretti cannot recall why, when, or how often he discussed the Hotel's permit application and this lawsuit with Tamarin or what was actually said during those discussions. On the contrary, two facts emerge quite clearly from the smokescreen that is Fioretti's testimony: (1) he kept Tamarin fully apprised about the status of the Hotel's permit applications and the proceedings in this case and (2) he was extremely concerned about the Union's reaction to anything he might say or do with respect to the applications or this case.

Apparently, Fioretti's desire to please the Union was also evident to Ty Tabing. Tabing testified that he met with Fioretti and others on June 12, 2007, just days before Fioretti spoke at the Union rally and the Hotel asked to meet with him to discuss its application. (*Id.* 218.) After the meeting, Tabing sent an email to various City employees, saying: "As we approach the four year anniversary of the labor strike in front of the hotel, I don't get the sense any new development will be happening until the labor issue is resolved." (*Id.* 232-33; *see* Pl.'s Ex. 44.)[6]

---

[6]Tabing could not recall what topics were discussed during that meeting but he is sure that permits, the strike and the existence of any relationship between the two were not among them. Moreover, though he is certain the opinion he gave in the email was not based on anything Fioretti said, he could not explain how he knew that, given his inability to recall the discussions at the meeting.

Plainly, Fioretti is fully committed to supporting the Union in its strike against the Hotel, which he is entitled to do. He cannot, however, use his control over the permit process, the existence of which he so forcefully proclaimed at the Union rally, to pressure the Hotel to end the strike. *See Golden State*, 475 U.S. at 619. But the only reasonable conclusion that can be drawn from the credible evidence is that the Union's desire to end the strike was the primary, if not the only, factor Fioretti considered in deciding to oppose the Hotel's sidewalk café permit applications. Fioretti's own words and actions (including sending Jubeh to attend a negotiating session between the Hotel and the Union), his knowledge of the Union's power to unseat him as it had Haithcock, and his constant contact and coordination with Tamarin make it clear that Fioretti conditioned his approval of the Hotel's application for a sidewalk café permit on its settlement of the labor dispute.

The evidence suggesting that other concerns were at play is both sparse and incredible. Though Jubeh said she received complaints about the Hotel's condition that she passed on to Fioretti, there is no evidence that such complaints were made before the strike. Moreover, Jubeh could not provide any details about the complaints, did not inquire about their source and did not give the Hotel any documents relating to them, though plaintiff said it repeatedly asked the Alderman's office to do so. Further, Fioretti did not cite the Hotel's condition as a reason for denying the permits at the Union rally or anywhere else.

Fioretti also said his decision reflected his concern that the Hotel's operation of a sidewalk café in the midst of a strike might lead to confrontations between strikers and café patrons. (*Id.* 83-84, 143-45.) But this testimony is incredible as well, given his failure to voice this purported concern to the Hotel, the Transportation Committee or the City Council.

26

In sum, the Court finds that the credible evidence presented by the parties establishes that the City, through Fioretti, conditioned the approval of the Hotel's 2007-09 sidewalk café applications on the resolution of its labor dispute with the Union. By doing so, the City has impermissibly intruded into the collective bargaining process, which is a violation of the NLRA. *See Golden State*, 475 U.S. at 619.

**Damages**

To support its claim for section 1983 damages for defendants' NLRA violations, plaintiff offered the testimony of James Stuerebaut, who has been the Hotel's controller for the last six years. (Tr. 378.) Though he is not a CPA and has no specific experience with outdoor cafés, he has spent more than thirty years in the field of hotel accounting, starting as a night auditor and working his way up to controller. (*Id.* 380-85.) Stuerebaut prepared an estimate of the expenses the Hotel incurred and the profits it lost as a result of defendants' unlawful conduct. (*Id.* 385; *see* Pl.'s Ex 143A.)

Among the expenses included in Stuerebaut's estimate is a $1,000.00 payment the Hotel made to the Adkins firm for preparation of a sidewalk café application. (Tr. at 395; Pl.'s Ex. 143A.) But the payment was made on December 7, 2007, just two days after the firm submitted its proposal for the work (*see* Pl.'s Ex. 71), and neither the date of the payment nor the date of the proposal meshes with the established sequence of events. The record shows that the Hotel's first sidewalk café application was given to, and derailed by, Haithcock in 2006. Fioretti refused to revive that application when he became Alderman, so the Hotel sent him two additional applications, one dated November 7, 2007 (for the remainder of the 2007 season) and the other dated December 6, 2007 (for

the 2008 season). Because the Hotel submitted these applications before December 5, 2007, the date of the Adkins firm's proposal to prepare the Hotel's application, it is difficult to see how the $1,000.00 payment pertains to them.

Perhaps the payment was related to the Hotel's application for the 2009 season, which was submitted directly to the City Council in May 2009. But that would mean Adkins prepared, and the Hotel paid for, a sidewalk café application more than a year before it was submitted, a highly unlikely scenario given the preparation/submission cycles of the Hotel's other applications. Plaintiff offers no explanation for the discrepancy between the dates of the proposal and the Hotel's $1,000.00 payment, on the one hand, and the dates it submitted its café applications to defendants, on the other. Consequently, the Court cannot conclude that the $1,000.00 payment is attributable to defendants' illegal conduct.

Stuerebaut's expense estimate also includes $1,750.00, which the Hotel paid to Adkins in February 2008 for the first and third items of work identified in a bill dated July 16, 2000. (*See* Pl.'s Ex. 1.) Even if the bill is incorrectly dated, though no one testified that it is, the first item is for time Adkins spent on the 2006 application given to Haithcock. (*Id.*) Because plaintiff did not prove that Haithcock violated the NLRA, neither that expense, nor the $8,042.20 in fees the Hotel paid Graham for working on the 2006 application (Tr. 421), is recoverable.

The same is true for the third entry on the July 16, 2000 bill, which is for four hours Adkins spent on "[t]rips to city hall's DCP departments for the second café permit twice and reprinting the plans." (*Id.*) Given the number of submissions the Hotel made to the City, it is not clear whether "second café permit" refers to a follow-up submission to Haithcock, one of the applications it gave to Fioretti in November and December 2007, or the one it submitted to the City Council in May

28

2009.  Plaintiff cannot recover for work on submissions to Haithcock.  And, though plaintiff proved its NLRA claim against Fioretti, it cannot recover the costs of preparing the November 2007 application because the Hotel would have had to incur those costs as well as the $5,006.00 it spent on furniture, equipment and supplies for the café, even if Fioretti supported its plans.  In short, because the Hotel has not established that some or all of the $1,750.00 paid to Adkins or the $5,006.00 café expenditures were caused by defendants' NLRA violations, it cannot recover them in this suit.

Stuerebaut also estimated that the denial of the Hotel's permits caused it to lose a total of $199,381.00 in profits for the 2006-09 café seasons ($23,849.57 for 2006, $27,969.27 for 2007, $28,147.88 for 2008, and $119,416.25 for 2009.[7])  (*Id.* 408-17.)  Profits for the 2006 season, of course, must be excluded.  But the estimate, which Stuerebaut admits is not based on hard data (*id.* 429; *see id.* 460), has other problems as well.

One of them is Stuerebaut's assumption that sixty percent of the café's seats would be occupied during both the lunch and dinner period each day of each season.  Stuerebaut said he based this assumption on:  (1) the Hotel's location, across from Grant Park and a few blocks from the Art Institute and Millennium Park, which "generate[] a lot of foot traffic"; and (2) the fact that there are no other outdoor cafés on the 520 block of South Michigan Avenue.  (*Id.* 398.)  He did not, however, investigate the average occupancy rates of other sidewalk cafés or otherwise explain why the café's proximity to certain sites supports a sixty percent occupancy rate as opposed to some other rate. (*Id.*)

---

[7]Stuerebaut said that the net profit estimate jumped up in 2009 because the Hotel requested more seats in that application.  Stuerebaut did not, however, adjust the 2009 occupancy rate to reflect the larger number of seats.

Even so, given his more than thirty years in the hotel accounting business, Stuerebaut's observations might be sufficient foundation for his assumption. But he did not testify about any specific observations or explain how they might support his assumption. Absent supporting data or theories, Stuerebaut's occupancy rate assumption is unreliable.

Another assumption underlying Stuerebaut's lost profits estimate is that the café's occupancy rate would be constant on each calendar day between April 1 and September 30, 2006, *i.e.*, that the weather would not impact the café's business. (*Id.* 431-33.) That might be a reasonable assumption for sidewalk cafés in other places, but it is patently unreasonable one for a café located here.[8]

Stuerebaut also assumed that the average bill for lunch in the café would be $11.00, which he said was based on the lunch revenues from the Hotel's indoor restaurant. (*Id.* 400-01.) But $11.00 is the average price of a meal on the restaurant's lunch menu, not the average bill for lunch at the indoor restaurant. (*Id.* 400.) Thus, Stuerebaut's "average" may be totally unrelated to the price of lunches actually ordered at the indoor restaurant or those most likely to be ordered by patrons of the café and does not account for the possibility that the outdoor café might take business away from, rather than generate business in addition to, the indoor restaurant.

Stuerebaut's estimate that the café would have had dinner revenues of $274,939.00 is similarly flawed. For example, when he was asked why he estimated the same amount of beverage revenue – twenty percent of food revenue – for both the lunch and dinner periods, he said: "That's just how we felt. You know, we were conservative in our approach." (*Id.* 408.) He also said he set the café's beverage percentage thirteen points lower than the indoor restaurant's rate to account for

---

[8]The assumption is also unnecessary because Stuerebaut could have used historical weather reports to calculate the average number of days each season that the café would have been shut down or its hours curtailed because of the weather.

30

the business of the Hotel's popular sports bar. (*Id.*) He did not, however, explain how he determined, or even say that he made a determination rather than a guess, that thirteen percentage points was the appropriate reduction.

Stuerebaut's cost estimates, which he deducted from the revenue estimates to obtain the net loss for each year, are faulty as well. He based the estimates on historical data from the Hotel's indoor restaurant, but he made no adjustment for revenue streams that are unique to the indoor venue. (*Id.* 430.) Moreover, though he admitted each year had certain unique expense factors, he did not account for those factors for each year of his estimate. (*Id.* 436-48.)

In sum, though the evidence establishes that plaintiff suffered some monetary loss as a result of defendants' NLRA violations, it does not provide a reasonable basis for calculating the amount of that loss. As a result, the Court can award plaintiff only nominal damages for defendants' violations of its rights.


**<u>Injunctive Relief</u>**

Plaintiff also asks the Court to enjoin defendants from interfering with its negotiations with the Union. Injunctive relief is appropriate if plaintiff has no adequate legal remedy or will suffer irreparable harm if an injunction is not issued, the harm plaintiff will suffer without an injunction outweighs the harm defendants will suffer if one is issued, and the injunction will not harm the public interest. *Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). Plaintiff has established all of these elements.

Defendants' conduct has inflicted on the Hotel two injuries for which there is no legal remedy. The first is inflation of the Union's bargaining power. Defendants' refusal to give the

Hotel a café permit until the strike is settled gives the Union economic leverage in the bargaining process that it would otherwise not have. The dilution of the Hotel's bargaining power during Fioretti's tenure is an injury that cannot be quantified.

The same is true for the second injury the Hotel suffered, erosion of its competitive position. The Hotel's president, Shlomo Nahmias, testified that the Hotel must have the same amenities and features as other Chicago hotels, especially those located near it, to remain competitive. (*Id.* at 521-522.) Nahmias also testified that its five nearest competitors, the Hilton, the Essex, the Hard Rock, the Best Western and the Blackstone, all operated sidewalk cafés during the 2007-09 seasons. (*Id.* 515, 520-22.) Not having a sidewalk café during the same time period, Nahmias said, has put the Hotel at a competitive disadvantage (*id.*), another unquantifiable harm.

Absent injunctive relief, the Hotel's positions in the labor dispute and the marketplace will continue to erode. Yet granting such relief, which will simply require defendants to abide by the law, will harm neither them nor the public interest. Because plaintiff has proven that such relief is appropriate, the Court grants its request for an injunction.

32

**Conclusion**

For the reasons set forth above, the Court enters judgment:  (1) in favor of defendants and against plaintiff on plaintiff's section 1983 claim for violation of its equal protection rights; (2) in favor of plaintiff and against defendants on plaintiff's section 1983 claim for violation of the NLRA, and awards plaintiff $1.00 in nominal damages on that claim; (3) in favor of plaintiff and against defendants on plaintiff's claim for violation of the NLRA.  The Court hereby permanently enjoins Alderman Fioretti, and any other person acting in the capacity of Second Ward Alderman, and the City of Chicago from interfering with the Hotel's labor negotiations with the Union by conditioning the issuance of sidewalk café permits to the Hotel on its settlement of the labor dispute with the Union.

**SO ORDERED.**                                **ENTER:  September 28, 2009**


                                               **HON. RONALD A. GUZMAN**
                                               **United States District Judge**

33